**FEDERAL INSURANCE COMPANY**

v.

**GENERAL MACHINE CORPORATION.**

Civ. A. No. 87–1128.

United States District Court,
E.D. Pennsylvania.

Nov. 16, 1988.

Kevin F. Berry, Joseph A. Ross, Rawle & Henderson, Philadelphia, Pa., for plaintiff.

Richelle D. Hittinger, Ambler, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are the parties' cross motions for summary judgment and a joint stipulation of facts. For the reasons stated herein, summary judgment will be entered in favor of defendant and against plaintiff.

### I. BACKGROUND

#### a. Underlying Litigation

Plaintiff, Federal Insurance Company ("Federal") and defendant General Machine Corporation ("General") entered into an insurance contract whereby Federal would provide certain liability insurance coverage to General, and General would pay stated premiums for such coverage.

Federal brings this declaratory judgment action pursuant to 28 U.S.C. §§ 2201, 2202 against General to determine whether the comprehensive general liability insurance policy issued by Federal to General affords coverage for certain property damage claims asserted against General. This coverage dispute arose as a result of an underlying action filed in the Denver County District Court, Denver, Colorado, Civil Action No. 84–CV–11025. On November 6, 1984, the Public Service Company of Colorado ("PSC") filed an action against P.A.R. Alloy, Inc. ("PAR") for monetary damages incurred by PSC due to the delivery of allegedly defective dust collector cones by PAR. PSC alleged that these dust collector cones did not meet the hardness specifi-

cations contained in the October, 1980 contract between PSC and PAR. PAR joined General as a third-party defendant. PAR had contracted with General for the manufacture of the dust collector cones. PSC, alleging itself as a third-party beneficiary of the contract between PAR and General, filed a counterclaim against General for breach of contract, breach of implied warranty of fitness for a particular purpose and breach of implied warranty of merchantability. In accordance with local court rules governing mediation in Denver, a confidential settlement memorandum was filed on behalf of General. The parties to this civil action agree that the information contained in the settlement memorandum will constitute the facts in this case.

The dust collector cones or mechanical collector cones ("cones") were installed by PSC in the pollution control system for Unit No. 4 of PSC's Cherokee Station coalfired electrical generating plant. The cones were used to remove abrasive and corrosive ash particles from the plant's emissions. On October 3, 1980, PSC ordered 1,475 cones from PAR with an approximate Brinnell hardness of 550.[1] On October 7, 1980, PAR ordered 1,334 cones from General.[2] In November or December, 1980, General sold and delivered these cones to PAR for resale to PSC. General states that these cones met the specified requisite 500 Brinnell hardness. Neither PAR nor PSC performed any inspection or testing of the cones in 1980 for either hardness or wall thickness.

In April 1984, PSC shut down Unit No. 4 for periodic maintenance and repairs. At that time, PSC employees determined that many of the 1980 cones supplied by General were badly worn. PSC performed hardness tests on the cones and based upon these results claimed that the hardness levels of the cones failed to meet specifications. As a consequence, PSC removed and replaced all of the cones.[3]

PSC states that it expected ten to twenty years of useful life from the cones, and it received less than four years. As a result of this unmet expectation, PSC instituted suit in Denver District Court. PSC's complaint alleged causes of action for breach of contract, breach of implied warranty of fitness for a particular purpose and breach of the implied warranty of merchantability. PSC sought damages for the cost of the cones, freight, installation of the cones, removal of the cones and lost electrical generation due to downtime at Unit No. 4. PAR's amended third-party complaint against General set forth claims of common law indemnity, contractual indemnity and contribution among joint tortfeasors. PAR also claimed lost profits of $250,000 to $325,000 from General.

Federal had issued to General a general liability—automobile policy for the period June 30, 1982 to June 30, 1984, with a subsequent renewal to June 30, 1985. The limit of liability for property damage was $100,000 for each policy year.

General forwarded PAR's amended third-party complaint to Federal on February 18, 1985. General made a demand upon Federal to defend it from and indemnify it for PAR's claims. Federal agreed to provide a defense on behalf of General subject to a reservation of its right to deny coverage. Thereafter, Federal assigned Colorado counsel to defend the case. The Colorado action was eventually settled by a payment of $225,000.00. PAR's insurance carrier paid $100,000.00 and the remaining $125,000.00 was paid by General and Federal. Federal contributed $96,298.75 to the settlement because of payment of other Gen-

---

**1.** Brinnell hardness is the hardness of a metal or alloy measured by hydraulically pressing a hard ball under a standard load into a specimen. The hardness is expressed in a number, the higher number denoting a harder metal or alloy. Webster's Seventh New Collegiate Dictionary (1969).

**2.** Although there is some dispute as to whether PAR's specification was for 500 or 550 Brinell,

the parties have agreed, through their adoption of the settlement memorandum, that this difference is probably not significant to the case outcome.

**3.** It appears that PSC has destroyed or disposed of the cones thus, preventing any further testing from taking place.

eral claims. Federal's reimbursement, if any, is contingent on the outcome of this declaratory judgment action.

b. Applicable Insurance Policy Provisions

The insuring clause of Federal's comprehensive general liability policy to General found on page six of the policy provides in pertinent part:

The Company [Federal] will pay on behalf of the insured [General] all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent ...

Exhibit A to plaintiff's complaint.

The definitions of "property damage" and "occurrence" located at page three of the policy are necessary to fully understand the insuring clause:

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The following exclusions are contained in the policy and are referred to by the parties.

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

\* \* \* \* \* \*

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by an person or organization other than an insured;

\* \* \* \* \* \*

(n) to property damage to the named insured's products arising out of such products or any part of such products;

\* \* \* \* \* \*

(p) to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

Federal asserts that Exclusions (m), (n) and (p) preclude coverage for the claims of PSC and PAR, and therefore General must reimburse it for the $96,298.75 it contributed to the Colorado settlement. General argues that Exclusion (a) coupled with the affirmative statement of coverage indicates broad protection for the insured for proper-

ty damage caused by or related to the named insured products.

## II. DISCUSSION

### a. Summary judgment standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (*en banc* ), *cert. dismissed,* — U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). When there are no material facts in dispute, the interpretation of an insurance contract is a question of law, and the court may resolve the coverage of the policy. *Harad v. Aetna Cas. and Sur. Co.,* 839 F.3d 979, 982 (3d Cir. 1988); *Niagara Fire Ins. Co. v. Pepicelli,* 821 F.2d 216, 219 (3d Cir.1987).

Pennsylvania law governs this court's interpretation of the insurance policy's coverage.[4] Pennsylvania's principles of law governing interpretation of insurance policies are well-settled. The goal is to ascertain the intent of the parties as demonstrated by the language utilized in the insurance contract. *Mohn v. American Casualty Co. of Reading,* 458 Pa. 576, 326 A.2d 346 (1974).

Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to enforce that language. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 304, 469 A.2d 563, 566 (1983). If possible, a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions. *Houghton v. American Guaranty Life Ins. Co.,* 692 F.2d 289, 291 (3d Cir.1982). However, if the policy, when viewed as a whole, is reasonably susceptible to more than one interpretation, it is considered ambiguous. *Vlastos v. Sumitomo Ma-*

*rine & Fire Ins. Co.,* 707 F.2d 775, 778 (3d Cir.1983). Any legitimate ambiguity must be resolved against the insurer. *Id.* The principle of construing ambiguities against the insurer is fully applicable to policies purchased by commercial entities. *ACandS, Inc. v. Aetna Casualty & Sur. Co.,* 764 F.2d 968, 973 (3d Cir. 1985). *Little v. MGIC Indemnity Corp.,* 836 F.2d 789, 793 (3d Cir.1987).

### b. Occurrence

■ Federal's first argument is that there is no coverage for General under the policy because the claims do not arise out of an "occurrence" as defined by the policy. The policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." An "accident" is an event which takes place without having been foreseen, expected or anticipated by anyone. *M. Schnoll and Son, Inc. v. Standard Accident Ins. Co.,* 190 Pa.Super. 360, 363, 154 A.2d 431, 432 (1959); *Casper v. American Guarantee & Liability Ins. Co.,* 408 Pa. 426, 431, 184 A.2d 247, 249 (1962). "If an occurrence is the ordinary and expected result of the performance of an operation, then it cannot be termed an accident." *Schnoll,* 190 Pa.Super. at 364, 154 A.2d at 432.

Federal points to the settlement memorandum wherein General stated that it "expected testimony that a four year life [of these cones] is acceptable in the industry." Exhibit G to Joint Stipulation of Facts at p. 12. The court, when resolving all doubts in favor of the insured as it must do under the law, does not agree with Federal that this statement, in and of itself, can be construed to mean that General either expected or intended that the damage to the cones would result. The court finds that the undisputed facts, as stipulated to by

---

**4.** Pennsylvania's conflict of law analysis dictates that the interpretation of insurance contracts is governed by the law of the state where the insurance policy is issued and delivered. Penn-

sylvania law applies, because the instant insurance policy was issued and delivered in Pennsylvania. *Pittsburgh–Bridge & Iron Works v. Liberty Mut. Ins. Co.,* 444 F.2d 1286 (3d Cir.1971).

the parties, meet the definition of "occurrence" within the policy.

### c. Property Damage

██ The second argument made by Federal is that the claims made by General are not for "property damage." The policy defines that term to encompass two categories: 1) "physical destruction of tangible property ... including the loss of use thereof at any time resulting therefrom," and 2) "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence...."

Federal asserts that the first three items of damages sought by PSC (i.e. the cost of the original cones, the cost of installing the original cones, and the replacement cost for the new cones) are potentially covered under category 1 of the definition of "property damage," but Exclusion (n) excludes them as damages to the insured's own product. The fourth item of damages sought by PSC is lost generation of power during the period of replacement which falls within category 2 of the definition of "property damage." Since the court has already concluded an "occurrence" has taken place, the only way that Federal can disclaim for loss of use is if that claim falls within Exclusion (m). Finally, Federal argues that PAR's claim for lost profits by virtue of the shutdown of the Cherokee plant is not cognizable, because PSC was able to shift its load demand to its other power generating stations and therefore, any increased use of fuel was offset by the fuel savings at the Cherokee plant. The court does not agree. *See* Exhibit A to General's response to Federal's motion for summary judgment; *Baldt, Inc. v. American Universal Ins. Co.*, 599 F.Supp. 955 (E.D.Pa.1985).

### d. Exclusions (a), (m), (n), and (p)

██ Where an insurer seeks to disclaim coverage under an insurance policy by invoking an exclusionary provision, it is the insurer which bears the burden of proving that the exclusion is applicable to the particular case. *Daburlos v. Commercial Ins. Co.*, 521 F.2d 18 (3d Cir.1975).

General points to Exclusion (a) coupled with the affirmative statement of coverage in support of its position that coverage is owed to it under the policy. Federal asserts that Exclusions (m), (n) and (p) preclude coverage. Pennsylvania law states that not only must insurance policies be construed in favor of the insured, but "policies must be construed 'in a manner which is more favorable to coverage.'" *Imperial Casualty and Indemnity Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 131, n. 4 (3d Cir.1988) *citing Houghton v. American Guar. Life Ins. Co.*, 692 F.2d 289, 291 (3d Cir.1982).

General's initial argument is that there is an inconsistency between Exclusions (m), (n) and (p) which General relies on in denying coverage and the exception to Exclusion (a) which affords coverage for property damage resulting from a breach of warranty of fitness or quality of the named insured's products. This issue has not been specifically addressed by the Pennsylvania state courts, and the various courts throughout the United States which have spoken to it have arrived at irreconcilable conclusions.[5]

Courts which have afforded coverage to the insured after considering the issue have followed a similar line of reasoning. Exclusion (a) does not apply to a "warranty of fitness or quality of the named insured's products ...," thus, coverage is clearly afforded to the insured. The exclusions subsequent to Exclusion (a) do not unambiguously exclude coverage resulting from a

---

5. In *McCorkle v. Firemen's Ins. Co.*, 678 F.Supp. 562 (W.D.Pa.1988), the plaintiff insured argued that Exclusion (a) of his policy was ambiguous because it contradicted other exclusions in the policy. The court rejected this argument, and held that "[t]he exception to exclusion (a) cannot be viewed as contradicting any other exclusions. Exclusions should be analyzed against other exclusions." *Id.* at 564 (citations omitted). However, the exception in Exclusion (a) in that policy did not apply to an insured's products; whereas, in the instant case, Exclusion (a) did. Additionally, this court cannot tell from the opinion what the other exclusions were which led the *McCorkle* court to conclude that no ambiguity existed.

breach of the warranty of fitness or quality of the named insured's products. The courts have reasoned that any subsequent exclusion that attempts to limit or contradict the coverage afforded the insured in Exclusion (a) either creates an ambiguity which must be construed in favor of coverage, or that must be reconciled with Exclusion (a).[6]

Exclusion (n) of Federal's insurance policy does not apply to "property damage to the named insured's products arising out of such products or any part of such products." This means that there is no coverage for property damage to an insured's own product or work. This exclusion *precludes* claims for repair or replacement to the insured's own products. However, claims for loss of use or lost profits are not barred by this language. *Pittsburgh Bridge and Iron Works v. Liberty Mutual Ins. Co.*, 444 F.2d 1286 (3d Cir.1971); *Honeycomb, supra; Beckwith Machinery Co. v. Travelers Indemnity Co.*, 638 F.Supp. 1179 (1986).

Exclusion (a) of Federal's policy to General affords coverage to General for damages it has become legally obligated to pay because of property damage claims that go to a warranty of fitness or quality of General's products. Although this exception to Exclusion (a) creates a double negative, by doing so it appears that there is affirmative coverage to the insured. Exclusion (n) (commonly referred to as the work product exclusion) then states that the policy does not apply to "property damage to the named insured's products arising out of such products or any part of such products." The court is persuaded by the courts' reasoning in the cases discussed in General's memorandum of law in support of its motion for summary judgment and concludes that the exclusions in Federal's

policy to General are irreconcilable and ambiguous. If Federal wanted to exclude this type of damage from coverage, it should have done so clearly and in a straightforward manner in the policy. Accordingly, the court will construe the policy in favor of coverage to General.

Alternatively, the court finds that in light of the diversity of opinion in the United States regarding this issue, the court will construe this difference of interpretation in favor of the insured. *Myrtil v. Hartford Fire Ins. Co.*, 510 F.Supp. 1198 (E.D.Pa.1981); *Cohen v. Erie Indemnity Co.*, 288 Pa.Super. 445, 432 A.2d 596 (1981); *Armon v. Aetna Casualty & Surety Co.*, 369 Pa. 465, 87 A.2d 302 (1952).

CONCLUSION

Based upon the foregoing discussion, summary judgment will be entered in favor of General and against Federal.

---

6. With respect to Exclusion (m), the settlement memorandum states that the injection of sulphur trioxide in the cones may have increased the wear and tear. These cones are unavailable for one reason or another, and so, construing all inferences in favor of the insured, the cones were physically injured. The power plant and the pollution control system were also physically injured since the cones were an integral part of the pollution control system, as well as the

power plant itself. *See Honeycomb Systems, Inc. v. Admiral Ins. Co.*, 567 F.Supp. 1400 (D.Maine 1983), *citing Int'l Hormones, Inc. v. Safeco Ins. Co.*, 57 A.D.2d 857, 394 N.Y.S.2d 260 (2d Dept.1977).

Exclusion (p) deals with products that are withdrawn from the market or from use because of any known or suspected defect or deficiency. The facts of this case do not fit within this exception.