**UNITED STATES FIDELITY & GUARANTY COMPANY,**
Plaintiff,

v.

**BARRON INDUSTRIES, INC., the New York Blower Company, Mechanovent Corp., Dravo Corp., and Continental Energy Associates, Defendants.**

No. 3: CV 91–1363.

United States District Court, M.D. Pennsylvania.

Dec. 18, 1992.

Cody H. Brooks, Kreder, O'Connell, Brooks & Hailstone, Scranton, PA, Stephen C. Baker, Stradley, Ronon, Stevens & Young, Lee A. Rosengard, Stradley, Ronon, Stevens & Young, Wayne, PA, Raymond Oechsler, Stradley, Ronon, Stevens &

Young, Philadelphia, PA, for plaintiff U.S.F. & G. Co.

Zygmunt Ronald Bialkowski, Jr., Bialkowski, Savitsky & Polachek, Scranton, PA, for defendants Barron Industries, New York Blower Co. and Mechanovent Corp.

Kenneth R. Bruce, Pittsburgh, PA, for defendant Dravo Corp.

Joann M. Lytle, Robert A. Prentice, Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, PA, for defendant Continental Cogeneration Corp.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

Plaintiff, United States Fidelity & Guaranty Company (hereinafter USF & G) brings this diversity based declaratory judgment action against its insureds, Barron Industries, Inc., New York Blower Company, and Mechanovent Corporation (hereinafter collectively referred to as Barron) to determine whether an insurance policy issued by USF & G to Barron affords coverage for certain property damage claims asserted against Barron. This coverage dispute arises directly out of an underlying action in the Luzerne County Court of Common Pleas wherein Continental Cogeneration Corporation (hereinafter CCC), Continental Energy Associates (hereinafter CEA) and Dravo Corporation are adverse parties to Barron.

Currently, there are two motions pending before the Court[1]: (1) Plaintiff's motion for summary judgment; and (2) Barron's motion for a Protective Order and to strike. (Doc. Nos. 16 and 32, respectively). The Court will review and analyze both motions in the present Memorandum and Order.

## BACKGROUND

In order to fully understand the present action, it is necessary first to describe the events leading up to and involved in the pending state court litigation.

On March 19, 1987, CEA and Dravo entered into a "Turnkey Construction Contract[2]" whereby Dravo agreed to design and construct by April 10, 1989, a Gasification Facility for CEA's cogeneration plant in Hazleton, Pennsylvania. Thereafter, on December 27, 1987, Dravo entered into a Purchase Order Agreement with Defendant insureds (Barron, New York Blower Co., and Mechanovent Corp.). In accordance with the terms of the Purchase Order Barron was to:

> Provide all necessary labor, material, supervision, inspection, equipment and supplies to fabricate, assemble, clean, prime and paint, test and load for shipment to the Humboldt Gasification Facility in Hazelton, Pennsylvania two (2) Process Gas Fans in strict compliance with Dravo Wellman Specification W4412–E–12341 General Revision dated October 14, 1987, General Mechanical Specification W4412 dated September 24, 1986, and the Technical Classifications and Exceptions.

(Doc. No. 30, Exh. E, p. 3).

Dravo then began construction of the Gasification Facility. By the Fall of 1989, however, problems allegedly related to the design and installation of the Barron Process fans began surfacing at the job site. In particular, the shaft/seal system caused an explosion on November 15, 1989,[3] which bent and damaged an I-beam support. (Doc. No. 30, Exh. D, p. 6). In addition, on December 10, 1989, a fire was detected in the seal duct cavity of one of the Barron Process fans resulting in damage to the

---

**1.** It should also be noted that on November 6, 1992, Barron filed a cross-motion for summary judgment. (Doc. No. 43). Barron filed this motion despite the Court's Amended Practice Order which directed that all summary judgment motions be filed on or before *June 1, 1992.* (Doc. No. 11). In light of our Practice Order and the extreme untimeliness of Barron's motion, the Court will not accept or review Barron's cross-motion for summary judgment.

**2.** A turnkey project is one in which the contractor is engaged to design, construct, and otherwise ready the plant for operation and then to turn over the key to the owner. *See Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1418 (3d Cir.1991).

**3.** There is some conflict in the record as to whether the date was November 15, 1989 or November 7, 1989. This conflict, however, is immaterial and will in no way effect the Court's consideration of the pending motions.

seal duct and the seal duct insulation and wiring, all of which were supplied and installed by Dravo. (Doc. No. 30, Exh. D, p. 16).

As a result of these problems, CEA served upon Dravo a Notice of Contract Events of Default. Dravo was then given a period of time to cure the alleged events of default, but was unable to do so. Accordingly, CEA, by letter dated February 16, 1990, terminated the contract and commenced suit against Dravo in the Luzerne County Court of Common Pleas. (Doc. No. 30, Exh. E, p. 9). Dravo in turn joined Barron as a third-party Defendant.

Dravo's third-party complaint reiterates many of the allegations contained in CEA's complaint. In particular, Dravo cites the following problems related to the alleged deficiencies in the Barron Process Fans:

8. On or about December 10, 1989, a fire was detected in the seal duct cavity of one of the Barron Process fans installed at the coal gasification facility.

9. As a result of the fire, the seal duct and the seal duct insulation, both supplied and installed by Dravo, were damaged.

10. Further, upon inspection of the Process Gas Fans after the fire, cracks were detected in one of the Process Gas Fans supplied by Barron.

(Doc. No. 30, Exh. E, pp. 3–4).

As a result of the third-party suit against Barron, USF & G, as Baron's insurer, filed the present action in District Court seeking a declaration that it has no obligation to defend Barron in the underlying state court action.

I

DISCUSSION

A. Summary Judgment

On June 1, 1992, USF & G filed a motion for summary judgment contending that it is not obligated to defend Barron because "no coverage is conceivably possible for Dravo's claims against Barron." (Doc. Nos. 16 and 17, p. 18, respectively). In support of this contention USF & G posits that: (1) Barron cannot establish compensable "property damage" as defined in the policy; (2) Barron cannot establish an "occurrence" or "incident" within the meaning of its policies; (3) even if there is an "occurrence", it happened after the policy period; (4) even assuming "property damage" caused by an occurrence within the policy period, certain policy exclusions preclude coverage; and (5) Barron's notice was untimely thereby precluding coverage. (Doc. No. 17).

When reviewing motions for summary judgment, Federal Rule of Civil Procedure 56(c) requires that we render summary judgment "... forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–8, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

A fact is "material" if proof of its existence or nonexistence would effect the outcome of the lawsuit under the law applicable to the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Levendos v. Stern Entertainment Inc.*, 860 F.2d 1227, 1233 (3d Cir.1988). An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party.[4] *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514; *Hankins v. Temple University*, 829 F.2d 437, 440 (3d Cir.1987); *Equimark Commercial Fi-*

---

4. In this sense, the summary judgment standard mirrors that which applies to a directed verdict under Federal Rule of Civil Procedure 50(a), i.e., that the trial judge must direct a verdict if, under the governing law, there can be only one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511.

*nance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987).

In determining whether an issue of material fact does exist, all inferences must be drawn against the moving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir.1988); 6 J. Moore, *Moore's Federal Practice* ¶ 56.04[2]. In order to stave off a summary judgment motion, however, the non-moving party may not rest on the bare allegations contained in his or her pleadings. Once the moving party has satisfied its burden of identifying evidence which demonstrates an absence of a genuine issue of material fact, *see Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988), the nonmoving party is required by Federal Rule of Civil Procedure 56(e)[5] to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When Rule 56(e) shifts the burden of proof to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark, supra* at 144. If, however, "the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Advisory Committee Notes to Fed.R.Civ.P. 56(e) (1963 Amend.).

■ Pennsylvania law governs this Court's interpretation of the insurance policy's coverage.[6] Pennsylvania's principles of law governing interpretation of insurance policies are well-settled. The goal is to ascertain the intent of the parties as demonstrated by the language utilized in the insurance contract. *Federal Insurance Company v. General Machine Corporation*, 699 F.Supp. 490 (E.D.Pa.1988).

> Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to enforce that language. If possible a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions.

*Id.* at 494 (citations omitted).

The Court will utilize the above standards when reviewing USF & G's pending motion for summary judgment.

### 1. Property Damage as Defined in the Policies

■ USF & G's first argument is that Barron cannot establish compensable property damage as defined in the policy. Pursuant to the terms of the policy, USF & G agreed to:

> [p]ay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "prop-

---

**5.** In relevant part, Rule 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**6.** For a long time Pennsylvania was among those jurisdictions applying a stiff approach to determining the appropriate law to apply in a given case. So that in a tort case, the place of the injury (*lex loci delicti*) rule was followed, and in a contract matter the case was governed by the law of the state where the contract was made. More recent opinion, however, is that these rules should be changed in favor of a more flexible rule which permits an analysis of the policies and interests underlying the particular issue before the Court. *See Jewelcor Incorporated v. St. Paul Fire and Marine Insurance Company*, 499 F.Supp. 39, 41 (M.D.Pa.1980) (Conaboy, J.). Indeed, this case is a classic example of the need to move away from a plastic or stiff approach whereby choice of laws would be determined by either the place of injury or the place of the contract.

While the contract between USF & G and Barron was formed in Illinois, the subject of the underlying lawsuit is entirely located in Hazelton, Pennsylvania. Additionally we find that the Commonwealth of Pennsylvania has a very substantial interest in protecting the rights of its corporate entities, as well as those with whom they do business. USF & G chose to do business within the confines of the Commonwealth of Pennsylvania, and the business of insuring against loss is one in which the Commonwealth has a very distinct interest.

erty damage" to which this insurance applies.... This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory." (Doc. No. 30, Exh. A, p. 1).

The policy defined property damage as "physical injury to tangible property, including all resulting loss to use of that property, or loss of use of tangible property that is not physically injured." (Doc. No. 30, Exh. A, p. 9).

USF & G maintains that the intent of the policy is to protect the insured against tort liability for physical injury and property damage to others. Thus, USF & G asserts, such policies do not provide coverage for the "contractual liability of the insured for economic loss because the completed work is not that for which the damaged person bargained." (Doc. No. 17, p. 9). USF & G likens the allegations contained in the underlying complaints to that of economic loss, claiming CEA is seeking to recover only substantial delay and completion damages against Dravo as a result of Dravo and Barron's failure to provide CEA that for which it bargained, an operational gasification facility. (Doc. No. 17, p. 10). Based on this summarization, USF & G concludes there is no property damage, i.e. "physical injury to tangible property ... or loss of use of tangible property that is not physically injured," but only the economic loss resulting from Barron's defective contract performance. (Doc. No. 17, p. 10).

Barron and Dravo respond by arguing that the underlying lawsuit is more than a suit for completion damages and delay damages. Rather, Barron and Dravo assert, there are specific claims for the physical injury to the I-beam support, wiring, insulation, duct work and loss of use of the facility, all of which constitute property damage potentially covered by USF & G's insurance policies and thus, prevent an award of summary judgment. (Doc. No. 29, p. 3). We agree with Barron.

It is undisputed that the clause obligating the insurer to pay all "damages because of ... property damage" the insured is legally liable to pay, principally governs coverage for property damage liability. Despite its facially simple language, this clause yields several perplexing issues concerning the coverage it grants. For example, coverage under this language should not be confused with that granted by property and other casualty insurance. Liability insurance does not provide compensation for the property damage, but only protects the insured against legal liability incurred because of the damage. Note, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive general Liability Policy,* 68 MINN.L.REV. 795, 799 (1984).

Moreover, the term "property damage" is qualified by the term "tangible". Thus, the definition contemplates only property damage which is physical, capable of being touched and objectively perceivable and not intangible property, such as property that represents value but has no intrinsic marketable value of its own, (i.e. stock, investments, copyrights, promissory notes), property regarded as intangible rights (i.e. goodwill and reputation), and economic interests (i.e. overhead, profits, investment value and productivity). *Id.* at 801 (citations omitted).

The boundaries of the "property damage" definition can be visualized by considering a third party's factory which collapses through an insured's negligence. The factory is tangible property and the "property damage" definition is satisfied. The lost profits suffered by the third party as a result of the factory's collapse, however, are economic losses which are intangible and thus, outside the "property damage" definition. Thus, the collapse of the factory may constitute "property damage" while injuries flowing from it do not. *Id.*

Although USF & G attempts to argue that the only damages alleged by CEA are that of substantial delay and completion damages, which clearly represent economic interests not covered by the policy, USF & G has completely overlooked the fact that

CEA has also specifically alleged physical injury to the I-beam support, wiring, insulation, and duct work, all of which come within the confines of the "property damage" definition. *See Beckwith Machinery Co. v. Travelers Indem. Co.*, 638 F.Supp. 1179, 1185 (W.D.Pa.1986); *St. Paul Fire and Marine Insurance Co. v. Sears, Roebuck & Co.*, 603 F.2d 780, 784 (9th Cir.1979) (where there is some damage to property other than that which consists of the insured's product, there is covered property damage).

■ Also overlooked by USF & G is CEA's claims for loss of the facility. Loss of use of tangible property occurs when the insured's product is incorporated into a larger tangible entity and the incorporated product causes the entire entity to fail. Note, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive general Liability Policy*, 68 MINN.L.REV. 795, 804 (1984). For example, a motor supplied by the insured is incorporated into an engine. The motor fails, but no physical harm occurs to the rest of the engine. The motor's failure, however, may decrease or eliminate use of the entire engine, thereby triggering coverage. Like the example used above, Barron supplied Process Fans which were incorporated into CEA's Gasification Facility. The fans allegedly failed, causing CEA to suffer a loss of use of the facility. Similarly, CEA's claim for loss of use of the facility in the present case amounts to "property damage" contemplated by the terms of the policy.

Accordingly, we find that CEA has alleged "property damage" as defined in the policy.

### 2. An "Occurrence" or "Incident" as Defined in the Policies

■ USF & G next maintains that Barron cannot establish an "occurrence" or "incident" within the meaning of the policy. The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. No. 30, Exh. A, p. 9). USF & G contends that according to Barron's notice of claim and follow-up report, Dravo's breach of contract claim against Barron is the purported "occurrence" or "incident" for which Barron seeks coverage under its policies. (Doc. No. 17, p. 10).

Barron contends that there were two occurrences alleged by CCC/CEA and Dravo: (1) the November 15, 1989 explosion and the December 10, 1989 fire; and (2) the cracking of the fan blades. (Doc. No. 29, p. 23).

A plain reading of the underlying complaints, as well as the insurance policy lends credence to Barron's position. Both CEA's complaint against Dravo and Dravo's third party complaint against Barron specifically cite the November 15, 1989 explosion and the December 10, 1989 fire as incidents causing damage to the physical property of the facility. Thus, the explosion and the fire are the occurrences and not the actual filing of the third-party complaint.

### 3. The Timing of the Event For Coverage Purposes

The next theory presented by USF & G is that the subject claims fall outside the policy period which ended on January 15, 1990. (Doc. No. 17, p. 12). Again USF & G reaches this conclusion by asserting that Barron's claims arise from CEA's termination of the primary contract with Dravo and CEA's subsequent action against Dravo. As such, USF & G contends the termination of the contract, which occurred on February 23, 1990, fixed the time of the alleged occurrence or incident under the policies.

As discussed above, the occurrence in the present action is the November 15, 1989 explosion and the December 10, 1989 fire, and not the filing of the third party complaint. Accordingly, the claims clearly fall within the policy period.

### 4. Policy Exclusions

USF & G also contends that even assuming "property damage" caused by an occurrence within the policy period, certain ex-

clusions, specifically, (a), (j), (k), (*l*) [7], (m), and (n) preclude coverage.

Although USF & G relies on several exclusions, it does not present its position clearly, completely failing to present any meaningful discussion of the exclusions and their applicability to the present case. In addition, USF & G has failed to cite a single case where a Court held either directly or by analogy that a similar or identical exclusion precluded coverage in a similar factual contest. As the Honorable Sylvia Rambo, Judge for the Middle District of Pennsylvania, noted of this type of conduct, "the net effect of this approach is to put the Court in the position of doing the parties' work for them. This Court has a full docket and plenty of work of its own without having to do lawyers' jobs for them." *Gossman v. Jimenez, et al.* Civil No. 91-0423 at p. 5 (M.D.Pa. April 17, 1992) (Rambo, J.). Judge Rambo went on to state that "a litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority ... forfeits the point. We will not do the research for him." *Id.* (quoting *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990)).

Notwithstanding this fact, the Court has reviewed the exclusions cited by USF & G and find they are not applicable to the present case and thus would not preclude coverage.

### 5. *Required Notice Under the Policies*

Lastly, USF & G contends that Barron's notice was untimely, thereby relieving USF & G of any obligation to defend Barron in the underlying suit.

The policy required Barron to notify USF & G "promptly of an "occurrence" which may result in a claim." (Doc. No. 30, Exh. A, p. 6). The policy further required that "if a claim" or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit." (Doc. No. 30, Exh. A, p. 6).

USF & G asserts that Barron was aware of the problems with its seals as early as Spring, 1988, when design defects forced Barron to search out alternative designs. (Doc. No. 17, p. 16). Moreover, USF & G claims that potential liability *should have been apparent* by Fall, 1988, from the "many problems that were surfacing at the job site." (Doc. No. 17, p. 16) (emphasis in original). Barron, however, did not provide USF & G with notice until May 1990, almost two months after Dravo's notice of termination of the contract.

Barron contends that it viewed the alleged problems with the fan/seal systems as only a minor aspect of a much larger dispute between CEA and Dravo concerning the overall design and construction of the plant. (Doc. No. 29, p. 15). Barron asserts that it had no serious concern that it would be sued until it received a letter from Dravo on February 23, 1990. (Doc. No. 29, p. 15).

Clearly, the disparity in the record as to notice reveals there exists genuine factual disputes, thereby preventing an award of summary judgment on this issue.

In addition, the Court notes that late notice will only release an insurance company from its obligations under a policy if the insurer can prove actual prejudice. *Trustees of University of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 896 (3d Cir.1987); *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977). This requirement of actual prejudice is due to the fact that most insurance contracts are not negotiated agreements but rather are dictated by the insurance company in all matters but price. *Brakeman*, 371 A.2d at 196. In *Brakeman*, the Court reasoned:

> The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can

---

7. After reviewing the record, however, it is clear that Barron does not dispute the fact that its policy precludes coverage for damage to its own product. Thus, exclusions (k) and (*l*) are no longer at issue.

proceed to disposition, either through settlement or defense of the claim.

Thus, a reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been if timely notice had been provided, e.g., being forced to pay a claim against which it has not had an opportunity to defend effectively. Where, [however], the insurance company's interests have not been harmed by a late notice, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligation under the policy in such a situation.

■ Although USF & G claims that by the time it received notice from Barron, USF & G was powerless to investigate the underlying defect in Barron's performance, or for that matter, to protect its rights in any way, USF & G has completely failed to support or substantiate this contention. (Doc. No. 17, pp. 16–17). The purpose of the prejudice requirement is to allow an insurer to refuse payment only if its procedural handicap has led to disadvantageous, substantive results—in other words, if the insured's violation of its contract has proximately caused its insurer damages. Thus, USF & G's conclusory allegation that it was unable to investigate Barron's defects or protect its rights, is too amorphous and unsupported to allow the Court to grant summary judgment.

## B. Motion for a Protective Order and to Strike

On June 30, 1992, Barron filed a Motion for a Protective Order and To Strike Exhibits 2C and 2D to USF & G's Statement of Undisputed Facts. (Doc. No. 32). In addition, because Barron claims it cannot trust USF & G to refrain from further disclosure of privileged documents in the future, Barron seeks a protective order that is "prospective in nature and broad enough in

scope to cover all of Barron's privileged documents." (Doc. No. 33, p. 10).

Barron contends Exhibit 2D, the May 2, 1990 notice letter from James McGrath [8] to USF & G's agent, Hargrave, Boston & Taylor, is protected by the attorney work product doctrine and attorney-client privilege, claiming that the notice letter contained the mental impressions, opinions, and conclusions of Barron's in house lawyer. (Doc. No. 33, p. 5). Barron likewise asserts that Exhibit 2C, Mr. McGrath's follow-up letter dated May 15, 1990, is equally replete with Mr. McGrath's mental impressions and conclusions concerning the underlying lawsuit and thus also protected by the attorney work product doctrine and attorney-client privilege. (Doc. No. 33, p. 6).

### 1. Attorney–Client Privilege

In Pennsylvania, the attorney-client privilege has been codified since 1887. Act of May 23, 1887, P.L. 158, S 5(d), 1887 Pa. Laws 158. The present codification provides:

> In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon trial by the client.

42 Pa.Cons.Stat.Ann. § 5928 (Purdon 1982).

■ It is often stated that the purpose of the attorney-client privilege is to encourage "full and frank communications between attorney's and their clients." See Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Full and frank communication is not an end in itself, however, but merely a means to achieve the ultimate purpose of the privilege: "promot[ing] broader public interests in the observance of law and administration of justice." Westinghouse v. Republic of the Philippines, 951 F.2d 1414, 1423 (3d Cir.1991) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981)). The Supreme Court recognized this underlying

---

**8.** Mr. McGrath is Vice President and Counsel of the New York Blower Company and Secretary of its subsidiary, Barron Industries.

**364**

rationale for the privilege long ago, when it stated:

> [The attorney-client privilege] is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or apprehension of disclosure.

*Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888) (quoted in *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682).

 Thus, when confronting the issue of whether the attorney-client privilege applies, Courts must look not only to the privilege itself, but also to the well-established rationale behind the privilege. After doing this, the Court would find it difficult to conclude that privilege applies to the factual situation demonstrated in the present case.

First, the Court notes that it is questionable whether Mr. McGrath was acting as Barron's attorney at the time the letters were written. The privilege does not exist just because one party to the communication has the title of "attorney".

In addition, the privilege does not extend to every written or oral communication by an attorney. Rather, the privilege applies only to discussions where the individual is acting as an advisor, i.e., presenting opinions and setting forth defense tactics as to the procedures to be utilized for an effective defense. The privilege simply does not attach to a discussion of the facts, no matter how extensive or involved the discussion may become.

A review of the letters at issue, reveals they contain only a discussion of the facts and do not in any way discuss unique legal theories or anticipated defenses. Accordingly, we find that the attorney-client privilege does not exist as to either Exhibit 2C or 2D.[9]

#### 2. *Attorney Work Product Doctrine*

 As to the attorney work product doctrine, that claim is equally meritless. Fed.R.Civ.P. 26(b)(3)[10], provides in pertinent part,

> a party may obtain discovery of documents ... prepared in anticipation of litigation ... by or for another party [and] the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney ... concerning the litigation.

Thus, the work product doctrine is designed to:

> protect the written records of an attorney's efforts, including statements, memoranda, correspondences, briefs, and mental impressions, obtained with an eye toward litigation. Courts have held work product immunity applicable to preliminary drafts of legal documents, license agreements and/or assignments, opinion letters and background memoranda with respect to scope and validity of patents and patent applications, and an attorney's analysis or assignments of a party's position with respect to other parties in an ongoing interference.

*Macario v. Pratt & Whitney Canada, Inc.,* 1991 Westlaw 6124, *4 (E.D.Pa.1991).

We find that like the attorney-client privilege, the work product doctrine does not protect the McGrath letters because they are factual in nature, not analytical. Furthermore, the letters do not contain confidential information, and do not appear to have been prepared in the context of a

**9.** The Court notes in passing that Barron is in essence asking that we expand the scope of the attorney-client privilege to accommodate communications between an insured and its insurer. Although this theory is coming to the forefront in modern insurance law, only a very limited number of states have expanded the privilege to include communications between the insured and its insurance company and Pennsylvania does not appear to be one of those states. *See Insured–Insurer Communications as Privileged,* 55 A.L.R. 4th 337. While the Court recognizes that the rationale behind the attorney-client privilege may be present, to a limited extent, in the insurance context, we find that for the reasons discussed above the attorney-client privilege does not exist in the factual situation of the present case.

**10.** Unlike the attorney-client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in the federal rules. *United Coal Cos. v. Powell Const. Co.,* 839 F.2d 958, 966 (3d Cir.1988).

possible defense or presentation of a unique legal theory.

Accordingly, we find that Barron is not entitled to a Protective Order and likewise deny Barron's Motion to Strike.

## II

## CONCLUSION

For the reasons stated above, USF & G's Motion for Summary Judgment is denied and Barron's Motion for a Protective Order and To Strike is denied.