PALMOLIVE CO. v. CONWAY et al.

No. 4523.

Circuit Court of Appeals, Seventh Circuit.

Feb. 13, 1932.

See also 37 F.(2d) 114.

Louis Quarles, Nathan Glicksman, and James T. Guy, all of Milwaukee, Wis., and Harry L. Butler and Ray M. Stroud, both of Madison, Wis., for appellant.

T. W. Brazeau, of Wisconsin Rapids, Wis., and Leo J. Federer, of Madison, Wis., for appellees.

Before ALSCHULER and SPARKS, Circuit Judges, and CARPENTER, District Judge.

ALSCHULER, Circuit Judge.

Appellant filed its bill against the tax commissioners of Wisconsin, seeking the cancellation of certain assessments for income taxes for the years 1924, 1925, and 1926, and injunction against collection of the taxes so assessed.

The cause was heard in the District Court, which dismissed the bill upon the merits, save as to an item growing out of the operations of the "Buckingham Agency," a subsidiary Illinois corporation. The appeal is from this decree, save as to that part relating to the Buckingham Agency.

The business, which involved mainly, if not entirely, the making and marketing of Palmolive soap, was first incorporated in 1894 in Wisconsin, and it grew rapidly, its sales in each of the years in question being about $23,000,000. Up to January 1, 1924, its entire business was conducted in Wisconsin, the manufacturing for supplying the United States and some other countries being done at its large factory at Milwaukee. The large profits of the business entailed large income taxes under the Wisconsin Income Tax Law (St. Wis. 1923, § 71.01 et seq., as amended).

By a series of intercorporate transactions, effective from December 31, 1923, all the stock of the Wisconsin company, as well as its property, passed to Delaware corporations, and its business offices were removed to Illinois, from whence, beginning with 1924, its commercial operations were mainly conducted. Under further intercorporate arrangement its products continued as before to be manufactured at the Milwaukee factory by the Wisconsin company, whose corporate existence had been preserved, and shipped out thence to the trade.

The quite complicated intercorporate transactions whereby these changes were effected are sufficiently set forth in the opinion of Judge Lindley in the District Court, as reported in 43 F.(2d) 226; and it would involve only repetition to undertake restatement here. Indeed, since we have reached the conclusion that the decree must be affirmed, and are in substantial accord with the reasoning of the opinion, we might refrain from further comment. But our study of the case induces us to present some further discussion.

Since the decree was entered the Supreme Court handed down an opinion in Hans Rees' Sons v. North Carolina ex rel. Maxwell, 283 U. S. 123, 51 S. Ct. 385, 75 L. Ed. 879, upon which appellant places much reliance. We gather from the report of that case, as well as from the report of it in 199 N. C. 42, 153 S. E. 850, from which last-named court the appeal was prosecuted, that the appellant there was a corporation of New York, where it had long been engaged in the business of handling sole and belting leathers. It had several factories, which were ultimately combined with its factory in North Carolina where for some time its leathers had been fabricated. The customary practice had been to ship the leather, when manufactured, to the taxpayer's warehouses in New York, where some finishing work was done and from whence it was distributed, except that such of the product as was cut up into pieces for retail use was generally shipped, under orders from New York, from the factory directly to the retailer. Of the taxpayer's total net income the tax commission allocated to North Carolina for the year 1923, 83+ per cent., for 1924, 85+ per cent., for 1925, 66+ per cent., and, for 1926, 85+ per cent., and assessed thereon the North Carolina statutory income tax. The court found that the percentage of income thus attributed to North Carolina was "out of all appropriate proportion to the business transacted by the appellant in that State," and that, "in this view, the taxes as laid were beyond the State's authority." Language was used indicating the court's appreciation of the importance of the buying and selling departments of the business, as well as of the manufacturing branch.

But we have here a situation quite different from that in the Rees Case. Until the removal of its offices to Illinois and its corporate headquarters to Delaware, the Palmolive business, in all its branches, was conducted in Wisconsin. The outstanding factor in its rapid and huge success was the persistent, effective, and highly expensive exploitation of its product. For years next preceding those in question millions were so expended in each year. The company's trade names, marks, and brands became ingrained and associated with the product which had thus become known to most households throughout the land, thus building up a good will of great value.

Advertising of this sort looks not to the past, but to the future. If it proves successful, its influence is of necessity projected indefinitely forward. Had the advertising of this product ceased when the offices were removed from Wisconsin, the momentum of the business, gained in Wisconsin, would no doubt have been a most significant factor in carrying it on, diminishing probably as time went on. But for the years in question, immediately following these great and effective expenditures, doubtless the continued sale of the product was induced in large degree through the operations for the years next before as carried on in Wisconsin.

Trade-marks, names, brands, and good will are as nothing when dissociated from articles to which they are applied or business wherein the good will arose. They could not be separately sold or transferred apart from the product or business to which they relate. Metropolitan Nat. Bank v. St. Louis Dispatch Co. et al., 149 U. S. 436, 446, 13 S. Ct. 944, 37 L. Ed. 799; Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769; Lindemann v. Rusk, 125 Wis. 210, 233, 104 N. W. 119.

The marks, brands, and good will which attached to this concern were woven about and intimately associated with the product of this factory, and so continued, even though the buying and selling functions were transferred from Milwaukee to Chicago. This great manufacturing plant grew with the company's growth, and was developed to fit into the company's peculiar requirements, and, notwithstanding the removal of the offices, the manufacturing continued in the same old way, in the same old place, to supply this prime essential of continued success.

The manufacturing contracts themselves indicate the quite indispensable relation of this particular factory to the organization. They specify the intent that the manufacturing shall be carried on as before, and standards and quality of the output maintained as theretofore; also that the quantity of the output be maintained, "it being understood that any failure on the part of the Wisconsin company so to do, or any suspension of operation by it from any cause whatsoever, would entail very heavy loss upon the Delaware company."

It cannot well be said that the Wisconsin factory, around whose operations and product this large good will was created, did not sustain, during the years when its entire product was contracted to the parent company, any different relation than would entire strangers to the organization to whom the manufacturing might have been committed. It is not at all likely that the parent company, with its imperative need for that continu-

ous and uniform production which had been so highly developed in Wisconsin, could have been so reliably and satisfactorily supplied by strangers to the organization as by this, its own constituent, or, rather, its other self.

Under the circumstances here shown a reasonable profit attributable to this manufacturing function cannot be adequately measured by a percentage of the cost of material and labor and the like. We are satisfied that every pound of product turned out by this factory during the years in question was impressed with a fair share of the benefit and profit directly resulting from the many millions theretofore invested with a view to their accrual in profits during the years next following.

We are of opinion that, not only is Rees thus distinguished, but that this consideration would of itself fairly justify the assessments here complained of.

In this connection it may again be said that the percentage of the entire income allocated by the tax commission to this manufacturing function is very much less than in the Rees Case, wherein the Supreme Court's conclusion was that the percentage of entire income attributed by the North Carolina tax commission to the manufacturing end of the business was too large.

But, apart from the foregoing, we will give some consideration to the Wisconsin company's profits as undertaken to be fixed by its contracts with the parent company. While intercorporate contracts fixing the income or profits of a subsidiary are not per se fraudulent or void as against state taxation of the subsidiary's income, concededly they will not stand in the way of ascribing to the subsidiary a reasonable income from the operations which it carries on within the income-taxing state. A stipulated percentage of profit upon manufacturing cost might in many cases be fair enough if all cost factors were included; but with substantial cost items omitted the agreed percentage might prove only a delusion.

■ The contract for 1924 accords to the Wisconsin company a profit of 3 per cent. of the "cost of manufacture"; that for 1925 and 1926 specifies 6 per cent. of "factory cost," the latter stipulating that factory cost shall "include only (a) cost of material, (b) cost of productive labor and (c) factory burden; and shall not include any items of general overhead expenses, such as interest, management and the like." Just why the second contract excluded from factory cost "items of

general overhead expenses, such as interest, management and the like" is not apparent. In a great business such as this, overhead is a very large item, and a very substantial part of it would be attributable to the manufacturing part of the business. "Management," "interest," and kindred items, included in the words "and the like," represent normal and substantial elements entering largely into the real manufacturing cost of the product.

■ We do not find in the record where the item of rent entered sufficiently into the manufacturing cost in one of the years, or at all in two of them. It is not enumerated in the items reported under the classification "factory burden," nor elsewhere as an element of cost for 1924 and 1925, and for 1926 there appears a rent item of but $65,127.93. Surely a reasonable rent of the necessary factory property and equipment would properly enter into manufacturing cost of the product, especially where, as here, the full capacity of the factory was devoted to this aggregate business, whose special requirements this factory supplied.

In the lease of the premises to the Wisconsin corporation by the subsidiary corporation to which the property had been conveyed, it was stipulated that the Wisconsin company's annual rent of the property should be the equivalent of 5½ per cent. of the investment therein together with the depreciation of the property. In reports of the interallied companies the value of the property was given as over $3,000,000, and this may be accepted as the investment therein, and 5½ per cent. thereof would be applicable upon the rent. Just what the depreciation was does not appear, but in the Wisconsin income tax return of this landlord subsidiary corporation there appears as income, under the classification of "Rent of Real Estate, Net and equipment," for 1924, $120,000, for 1925, $234,463.22, and for 1926, $231,108.62. It may be assumed that these amounts came from the taxpayer as factory rent.

There seems to be some contention to the effect that because the landlord corporation for these years enumerated these sums as income they should not be any factor in arriving at the income taxes of the Wisconsin company for the same years; but we see no relation between the returns by the landlord corporation as its income, and their inclusion by the Wisconsin corporation as part of the manufacturing cost of its product.

■ Taxpayer's disposition of rent in its return was as a deduction from gross income

under the classification "Rents and Royalties paid." The amounts for the respective years were $187,468.06, $295,146.97, and $280,443.-76. Royalties, if any, should surely be an item of cost of manufacture. These amounts, less the $65,127.93 of rent included as a cost item for 1926, should be added to manufacturing cost.

Interest would also be a significant item entering into cost. It does not seem that in the intercorporate arrangement any working capital remained in the Wisconsin corporation, notwithstanding the plan was that it should purchase from the parent company all its materials, pay for labor and all other manufacturing outlay, and bill the parent company for the product at cost plus the stipulated percentage. To carry on such a huge manufacturing business manifestly large funds were necessarily employed, which the parent company supplied, and for which the second contract specified interest to be paid by the taxpayer at 5½ per cent. per annum. The doubtless large outlay by way of interest which these capital requirements entailed—or which, at any rate, an independent manufacturing concern dealing at arm's length would necessarily have incurred—should in fairness be regarded as an item of cost of manufacturing.

Another considerable item which we believe should fairly have entered into cost of manufacturing grows out of the provision of the contracts that the parent company buy all materials required for manufacturing, and sell them to the Wisconsin company at cost. Had the Wisconsin company been wholly disconnected by interest or otherwise from the parent company, it would be idle to assume that the latter would have agreed to purchase this great quantity of materials (about $25,-000,000 at the cost price, for the three years) and to sell them at cost. It would be beside the question to surmise that the taxpayer might have purchased them as cheaply as could the parent company. It did not make the original purchase of them, but the contracts provided for a middleman to do the buying and selling; and a middleman's reasonable profit on resale to the taxpayer should have entered into the cost of the materials to the taxpayer. Here again, as in the other items considered, the apparent generosity of the parent company toward its subsidiary, the taxpayer, operated only to the parent's advantage in the fixing of the taxpayer's Wisconsin income tax; and that this was the intent and purpose which inspired these various intercorporate changes, conveyances, contracts, and removals is a conclusion quite inescapable.

It was testified that for 1924 the sum of $493,842.23, realized from the sale of the factory by-product of glycerine, remained in the manufacturing cost whereon the 3 per cent. was reckoned, but that proper accounting methods required such by-product sales to be deducted from factory cost, and that under the 1925–1926 contract the practice was adopted of deducting from manufacturing cost the glycerine sales, and figuring the 6 per cent. for those years upon the cost exclusive of the glycerine sales. So, while the second contract fixed the manufacturing profit at 6 per cent., the amount on which the 6 per cent. was reckoned was diminished by the glycerine sales of $668,049.46 for 1925 and $939,765.05 for 1926. By the same reasoning, if glycerine sales had been large enough there would have remained no manufacturing cost whatever. It is noteworthy that, while for these years the agreed percentage of profit was doubled, the tax yield was less than in 1924, wherein the glycerine sales were said not to have been deducted.

The record in respect to glycerine deduction is far from satisfactory. Neither the tax returns made for those years nor the corporate books indicate whether or not such deduction from manufacturing cost was in fact made. It is strange indeed that the first contract makes no mention whatever of the disposition of this very important item of glycerine sales, and far stranger that the second contract, if made in the light of the contended error in the treatment of glycerine sales for 1924, in no manner refers to glycerine, although enumerating what should be included and excluded in "factory cost."

In our judgment, if the cost-plus basis were followed, glycerine sales should not have been deducted from factory cost for the years 1925 and 1926. Their inclusion would quite substantially have increased the reported tax of the Wisconsin company for those years, and at the same time would not have done violence to the contract.

But it seems to us that the glycerine sales may be viewed in an entirely different light. If we accept the disposition of the glycerine sales as appellant contends, and sanction the price of the soap as determined under the contracts between the Wisconsin company and the parent company, the glycerine remained as surplus or profit which was earned and accrued through the manufacturing operations in Wisconsin. Under the contractual course of dealings the taxpayer sold the soap

to the parent company at the stipulated cost plus price. The glycerine, even if deducted from manufacturing cost, was left as a factory profit. Who in fact sold the glycerine, or which of these interallied companies ultimately received it or its proceeds, is of no consequence so long only as this surplus or profit was realized in Wisconsin.

It seems to us that under the state of the record it would be warrantable to treat all the glycerine sales as taxable income of the Wisconsin company which created it. So regarded, these items would of themselves go very far, if not entirely, toward sustaining the assessments.

We regard the 3 per cent. of profit as fixed in the contract for 1924 as grossly too small, and we believe we have referred to sufficient of the items to indicate that, even if six per cent. upon manufacturing cost as fixed in the second contract were to be accepted as a fair manufacturing profit, the actual manufacturing cost has been by this taxpayer very greatly understated, and that a proper inclusion of all cost items will go far toward justifying the assessments. Our best judgment is that, under the peculiar circumstances here appearing, 6 per cent. of manufacturing cost, even with all proper items included therein, would fall decidedly short of measuring the profit fairly attributable to the Wisconsin operations of this business for the taxable years.

We cannot present definite figures specifying the dollars and cents by which the several items discussed would increase the taxpayer's taxable income for these years as returned by the taxpayer. In our judgment the record does not admit of estimates materially better or closer than those which the tax commission made in its report and assessments. We believe that the taxpayer fell far short of discharging its statutory duty of making "a true and accurate statement" of its taxable Wisconsin income for these years, and we are led to conclude, as we did in Buick Motor Co. v. City of Milwaukee et al., 48 F. (2d) 801, 805, where a situation in some respects quite comparable was dealt with, that: "Generally speaking, strict mathematical certainty cannot reasonably be expected in such matters. In the routine of taxation as applied to ordinary business, slight departures either in method or computation involving trivial amounts will not be noticed. Having in mind the magnitude of the business here involved, we believe the commission reached a conclusion which sufficiently approximates justice between this taxpayer and the state as to require approval of the result."

The decree is affirmed.