**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0633n.06

Case No. 13-5539

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Aug 15, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LIBERTY CORPORATE CAPITAL LIMITED, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | KENTUCKY |
| SECURITY SAFE OUTLET, dba Bud's Gun | ) | |
| Shop; MATTHEW DENNINGHOFF, | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |

BEFORE: MOORE, WHITE, and DONALD, Circuit Judges.

**HELENE N. WHITE, Circuit Judge**. In 2010, BudsGunShop.com, LLC (BGS), brought an action against Security Safe Outlet, Inc. (SSO), and its employee Matthew Denninghoff, asserting the improper use of BGS's customer database and name. SSO notified its insurer, Liberty Corporate Capital Limited (Liberty), and sought a defense and indemnity under its commercial general liability policy. Liberty filed the instant action, seeking a declaratory judgment that it has no duty to defend or indemnify SSO and Denninghoff under the terms of the policy. The district court granted Liberty's motion for summary judgment, and SSO and Denninghoff appeal. Because the allegations in BGS's complaint in the underlying action do not bring the action within the scope of the coverage provided by SSO's policy, we AFFIRM.

**BACKGROUND**

BGS's claims against SSO have their roots in the two companies' business relationship. The following assertions of fact are taken from BGS's second amended complaint.

Marion E. "Bud" Wells formed SSO in June 2000, with Wells as SSO's sole shareholder. SSO operated a retail firearm and security safety store in Paris, Kentucky, under the name "Bud's Gun Shop." In 2003, SSO expanded its business to include online sales through a website at the internet domain name "budsgunshop.com," and hired Rex McClanahan to assist with the expansion. The online portion of the business was successful and, in 2006, "Wells and McClanahan began the process of spinning out the online business operations of SSO as a separate business entity" that became BGS. In August 2006, Wells and McClanahan executed a document called "BudsGunShop.com LLC Operating Agreement." In February 2007, BGS distributed a non-compete agreement that its employees, including Denninghoff, signed. On May 17, 2007, BGS filed its Articles of Organization as a Kentucky Limited Liability Company with the Kentucky Secretary of State, listing Wells and McClanahan as its sole members.

Meanwhile, Wells began to liquidate his interest in SSO. On January 1, 2007, Wells and Earley M. Johnson II executed a Stock Purchase Agreement in which Johnson agreed to purchase a one-half interest in SSO over a two-year period. In April 2009, Wells and SSO entered a Stock Redemption Agreement in which SSO redeemed all shares owned by Wells. As part of that transaction, SSO assigned its "federal and state trademark rights in the tradename 'Bud's Gun Shop,' as well as permutations of that name," to Wells. Wells licensed the rights back to SSO in a "Tradename License Agreement." The licensing agreement granted SSO the right to use the name in connection with its retail firearms store in Paris, Kentucky and a shooting or firing range business, but specified that SSO must discontinue using the name, and

- 2 -

that the license would immediately terminate, "if, over any one calendar month period during the term of this License, Licensee's over-the-counter sales of Firearms from the retail store comprise less than 85% of Licensee's total sales of Firearms for that month."

Even after the spin-off of BGS, SSO and BGS continued to operate out of the same building until January 2009, when BGS relocated to Lexington, Kentucky, and opened its own retail store. Meanwhile, however, from January 2007 to April 2010, SSO acted as one of BGS's product suppliers and drop-ship order fulfillment agents. For this purpose, BGS provided SSO access to certain areas of BGS's password-protected computer system. BGS contends that, although SSO's access allowed SSO to "theoretically . . . view individual customer data records one at a time," SSO did not have access to BGS's customer database, which had its own password and contained hundreds of thousands of customer records.

Denninghoff worked as a BGS employee from January 2007 through January 2010, doing IT work. BGS contends that while still a BGS employee, Denninghoff conspired with his sister, who was SSO's Vice President, to further SSO's plans to open a competing internet firearms sales operation; that in January 2010, Denninghoff quit without notice, via email, and within days started working for SSO; that Denninghoff "deliberately erased both the contents of his work email account and the contents of his work computer," but "secretly kept" a number of backup copies of BGS's customer database from various backup dates; and that as soon as BGS learned that SSO planned to open a competing internet sales operation, it terminated SSO's access to its computer network system, but SSO then asked for and obtained from Denninghoff a copy of a backup customer database and used customer information from the database to send mass promotional emails to BGS's Kentucky customers. Although BGS directed SSO to desist in its use of the customer information, SSO continued to send mass promotional emails using the

information.  BGS filed the underlying action against SSO in November 2010, asserting eleven claims, all grounded in allegations that SSO and Denninghoff misappropriated and used BGS's customer database, and continued to use BGS's name, and permutations of its name, after its license to do so had terminated.

SSO had a series of commercial general liability policies with Liberty that together provided coverage from September 2008 through September 2012 (the Policies).[1]  As relevant here, the Policies afford coverage for "bodily injury and property damage liability" and for "personal and advertising injury liability."  SSO argues that BGS's allegations in Counts I, II, and III of its second amended complaint—for violation of K.R.S. § 365.880, *et seq.*, (misappropriation of trade secrets); violation of 15 U.S.C. § 1125 (Lanham Act); and breach of the TradeName License Agreement—fall within the Policies' coverage for "property damage" and "advertising injury" liability, and that no exclusions apply.[2]

The following policy terms are relevant:

**<u>Coverage A  Bodily injury and property damage liability</u>**

**1.   Insuring Agreement**

**a.** We will pay those sums the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.

*See* R. 29-2, Policy No. L200805866 at 1.  The Policies define "property damage":

---

[1] The parties agree that the relevant provisions of the Policies are identical and that it is not necessary to determine which policy applies.

[2] The remaining counts were:  (IV) breach of fiduciary duty (Kentucky common law; (V) aiding and abetting breach of duty of loyalty (Kentucky common law); (VI) breach of contract—non-compete agreement (Kentucky common law); (VII) tortious interference with contract (Kentucky common law); (VIII) violation of 18 U.S.C. § 1030(a)(2) (Computer Fraud & Abuse Act); (IX) violation of 18 U.S.C. § 1030(a)(4) (Computer Fraud and Abuse Act); (X) violation of K.R.S. § 434.845 (unlawful access of computer); (XI) violation of K.R.S. § 434.855 (misuse of computer information).

**28.** "Property Damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

*Id.* at 20.

## **Coverage B Personal and advertising injury liability**

### **1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

*Id.* at 1.  The Policies define "personal and advertising injury," in relevant part, as follows:

**25.** "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

. . . .

**d**. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

. . . .

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

*Id.* at 19.  Coverage B is subject to exclusions, including:

    **a. Knowing Violation of Rights of Another**
      "Personal and advertising injury" caused by or at the direction of the insured
      with the knowledge that the act would violate the rights of another and would
      inflict "personal and advertising injury."
    . . . .
    **e. Breach of Contract**
      "Personal and advertising injury" arising out of a breach of contract, except an
      implied contract to use another's advertising idea in your "advertisement."
    . . . .
    **h. Infringement of Copyright, Patent, Trademark or Trade Secret**
      "Personal and advertising injury" arising out of the infringement of copyright,
      patent, trademark, trade secret or other intellectual property rights.

*Id.* at 6.

## DISCUSSION

We review the district court's award of summary judgment de novo. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). Summary judgment is appropriate if, drawing all reasonable inferences in favor of the nonmovant, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

The parties agree that Kentucky substantive law applies in this diversity action. Under Kentucky law, the determination whether the Policies require Liberty to defend and indemnify SSO in the BGS action is a question of law. *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810 (Ky. Ct. App. 2000) ("[I]nterpretation of an insurance contract is a matter of law for the court."). A determination that SSO is not entitled to a defense resolves the question whether SSO is entitled to indemnity. *See James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991) ("[T]he duty to defend is broader than the duty to indemnify."). Kentucky courts determine whether an insurer has a duty to defend its insured by comparing the language of the underlying complaint to the terms of the policy. *Id.* There is a duty to defend "if there is any allegation which potentially, possibly or might come within the

coverage of the policy." *Id.* (citing *O'Bannon v. Aetna Cas. & Sur. Co., Ky.*, 678 S.W.2d 390 (Ky. 1984)). Policy language is given its "plain and ordinary meaning," *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131–32 (Ky. 1999), and "interpreted according to the usage of the average man." *James Graham Brown Found.*, 814 S.W.2d at 280 (citing *Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205 (Ky. 1986)). Courts construe ambiguous terms against the insurer, in favor of the insured's reasonable expectations, *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003), and construe exceptions and exclusions "narrowly . . . to effectuate insurance coverage." *Hugenberg v. W. Am. Ins. Co./Ohio Cas. Grp.*, 249 S.W.3d 174, 186 (Ky. Ct. App. 2006) (citing *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky. 1992)). SSO has the burden to demonstrate that BGS's claims fall within the Policies' coverage. *N. Am. Acc. Ins. Co. v. White*, 80 S.W.2d 577, 578 (Ky. Ct. App. 1935). Liberty has the burden to prove that an exclusion applies. *Ky. Sch. Bds. Ins. Trust v. Bd. of Educ. of Woodford Cnty.*, No. 2002–CA–001748–MR, 2003 WL 22520018, at *9 (Ky. Ct. App. Nov. 7, 2003) (unpublished) ("[A]n insurer who disclaims its duty to defend based on a policy exclusion 'bears the burden of proving the applicability of the exclusion.'") (quoting *Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh v. Nat. Union Fire Ins. Co. of Pittsburgh*, 709 A.2d 910, 913 (Pa. Super. Ct. 1998)).

## I.

In Count I, misappropriation of trade secrets, BGS alleges that Denninghoff "secretly and improperly kept" a copy of BGS's customer database and disclosed the information in the customer database to SSO in violation of the terms of his non-compete agreement, and that SSO received and used the customer information from the database to generate mass promotional emails with full knowledge that the information was acquired by improper means. SSO argues that the allegations fall within the Policies' advertising-injury coverage because BGS seeks to

hold SSO liable for "injury arising out of . . . [t]he use of [BGS's] advertising idea in [SSO's] 'advertisement.'" R. 29-2, Policy No. L200805866 at 6. Specifically, SSO contends that the mass promotional emails are "advertisements" as defined in the Policies,[3] and "BGS's claim that SSO stole the customer email addresses and used them to create subsequent email blasts (advertisements) is an allegation that SSO improperly used BGS's 'advertising idea' in its advertisements." SSO Br. 16. Liberty acknowledges that BGS alleged that SSO used the customer database to send the emails, and that the emails may be advertisements under the Policies, but Liberty contends that BGS's misappropriation-of-trade-secrets claim nonetheless does not fall within the Policies' coverage for advertising injury because BGS did not allege that SSO or Denninghoff used any of its "advertising ideas" in the emails, and the customer database is not an "advertising idea." We agree.

### A.

The Policies do not define the term "advertising idea" and we found no Kentucky decisions construing the term.[4] When terms contained in an insurance policy have not acquired a technical meaning in law, "they 'must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured.'" *Hendrix v. Fireman's Fund Ins. Co.*, 823 S.W.2d 937, 938 (Ky. Ct. App. 1991) (quoting *Fryman*, 704 S.W.2d at 206).

---

[3]The Policies define an "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."

[4]In *Educational Training Systems, Inc. v. Monroe Guaranty Insurance Company*, 129 S.W.3d 850, 852 (Ky. Ct. App. 2003), the court assessed coverage under a policy defining "advertising injury" as injury arising out of, *inter alia*, "[t]he use of another's advertising idea in 'your advertisement,'" but the decision does not construe the term "advertising idea" or apply the term, as would be relevant here, to a trade secrets allegation regarding misappropriation of customer lists.

This court, construing an insurance policy under Wisconsin law, has found the term "advertising ideas" unambiguous. *See Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 802 (6th Cir. 1996) (stating, with respect to the terms "advertising injury," "misappropriation," "advertising ideas," and "style of doing business," "[e]ach of these terms has either an established dictionary meaning or a meaning derived from case law").

BGS's allegations regarding misappropriation and use of the customer database do not assert the use of an "advertising idea" as that term is commonly understood. Webster's Third New International Dictionary (2002) defines "advertising" as "the action of calling something . . . to the attention of the public especially by means of printed or broadcast paid announcements." *Id.* at 31. An "idea" is defined as, among other things, "a plan or purpose of action." *Id.* at 1122. Synonyms of "idea" include "plan," "scheme," "design," and "concept." Roget's 21st Century Thesaurus 436 (3d ed. 2013). The term "advertising idea" is therefore reasonably understood to encompass a company's plan, scheme, or design for calling its products or services to the attention of the public. *See Advance Watch*, 99 F.3d at 801 (taking note of the Wisconsin court's holding that "'advertising idea' should be understood in its ordinary meaning of 'an idea for calling public attention to a product or business, especially by proclaiming desirable qualities so as to increase sales or patronage'"); *see also State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1232 (11th Cir. 2004) (noting circuit precedent defining an advertising idea as "any idea or concept related to the promotion of a product to the public").

BGS's allegations regarding the misappropriation of its customer database do not fit within this understanding of the term. BGS describes the database as containing "names, email addresses, and other data," and alleges that SSO used the database to "send a mass promotional

email to all of the persons in the BGS [database] having a Kentucky address."[5]  The allegations thus describe the use of BGS's list of customers and their contact information, but do not allege, e.g., that SSO misappropriated and used any of BGS's advertising *plans*, *schemes*, or *designs* in its emails.  Other than stating that the email blasts were sent to Kentucky residents, the complaint does not describe the emails at all.

SSO directs our attention to the Ninth Circuit's decision in *Sentex Systems, Inc. v. Hartford Accident & Indemnity Company*, 93 F.3d 578 (9th Cir. 1996), to support its argument that BGS's allegations describe the use of an "advertising idea."  But the *Sentex* decision is consistent with our understanding of the term.  In *Sentex*, the plaintiff in the underlying suit brought a trade-secrets claim alleging that Sentex improperly obtained "knowledge, information and trade secrets, including customer lists, methods of bidding jobs, methods and procedures for billing, marketing techniques, and other inside and confidential information. . . ."  *Id.* at 580. The Ninth Circuit found that the allegations fell within the policy's coverage for "advertising injury," defined in part as injury as arising out of the "misappropriation of advertising ideas."  *Id.* In so deciding, the court reasoned that the ordinary meaning of the policy language was not limited to misappropriation of an advertisement's text; rather, it was "concerned with 'ideas,' a broader term," that "includes a wide variety of direct and indirect advertising strategies."  *Id.* Because the underlying complaint alleged not only the misappropriation of "customer lists," but also the misappropriation of "methods of bidding jobs, methods and procedures for billing, marketing techniques, and other inside and confidential information," the court found that its allegations fell within the policy's coverage for the misappropriation of advertising ideas.  *See id.* at 580–81  ("While we may agree . . . that the mere misappropriation of customer mailing lists,

---

[5]Consistent with BGS's allegations, at oral argument, counsel for SSO described the database as a "customer list," and stated that it contained merely customer names and addresses.

standing alone, may not bring a complaint within the scope of possible coverage for 'advertising injury' as 'misappropriation of advertising ideas,' it is clear that the scope of ESSI's lawsuit was much broader."). BGS's allegations in Count I are allegations of the "mere misappropriation of customer mailing lists," and do not include the broader misappropriation of advertising *strategies* that the *Sentex* court found equivalent to advertising *ideas*. *See Steinberg*, 393 F.3d at 1234 ("A confidential customer list is a trade secret, not an idea about advertising or an outward expression of a business's style."). Accordingly, the allegations do not fall within the Policies' coverage for misappropriation of advertising ideas. Because the allegations do not trigger coverage, we do not address the parties' arguments regarding whether the breach-of-contract exclusion applies.

## II.

BGS's Counts II and III are related. In Count II, BGS alleges that its name and variations of the name are protected marks under the Lanham Act, and that SSO's continued use of the marks after termination of the Tradename License Agreement violated the Lanham Act, 15 U.S.C. § 1125(a)(1). In Count III, BGS alleges that SSO breached the Tradename License Agreement, under which it had permission to use the "Bud's Gun Shop" name, and variations thereof, by continuing to use the name after its over-the-counter sales of firearms fell below a certain threshold. SSO argues that the allegations fall within the Policies' coverage for advertising injury and for property damage and that no exclusions apply.

## A.

SSO contends that the allegations in BGS's Counts II and III fall within the Policies' coverage for advertising injury that arises out of "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or *disparages* a person's or organization's goods, products, or services." R. 29-2, Policy No. L200805866 at 19 (emphasis

added). Specifically, SSO argues that BGS's contention that SSO's use of the name caused harm to BGS's "identity, reputation, and good will," is an allegation that SSO's use of its name "disparaged" BGS's goods, products, or services. Liberty concedes the point, stating that "a rational argument might exist that [SSO's] alleged breach of the license agreement and use of the name 'Buds' disparaged [BGS's] reputation," and focuses on arguing that certain exclusions preclude coverage. *See* Liberty Br. 37. Thus, we assume *arguendo* that Counts II and III fall within the Policies' coverage for advertising injury arising from publication of material that "disparages a person's or organization's goods, products, or services," and consider whether exclusions apply.

Liberty argues that the Policies' trademark-infringement and breach-of-contract exclusions preclude coverage for the allegations in Counts II and III. The trademark-infringement exclusion exempts from coverage personal and advertising injury "arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights." The breach-of-contract exclusion applies to advertising injury "arising out of a breach of contract." We agree that these exemptions preclude coverage for BGS's allegations in Counts II and III.

1.

Count II is a trademark-infringement claim. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760–61 (6th Cir. 2005) ("Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for infringement of marks and trade dress that have not obtained federal registration."). BGS contends that its name and variations of the name are protected "marks" under the Lanham Act, and that SSO's continued use of the marks after its sales fell below the threshold in § 2(a) of the Tradename License Agreement violated the Lanham Act, 15 U.S.C. §

1125(a)(1). The allegations thus fall squarely within the exclusion for advertising injury "arising out of the infringement of . . . trademark . . . rights."

SSO argues that the trademark-infringement exclusion is ambiguous because it contradicts the definition of what the Policies cover. Specifically, the Policies define "personal and advertising injury," in part, as injury arising from "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" But the Policies then exclude coverage for injury "arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights." The exclusion of coverage for injury arising out of infringement of "copyright . . . and other intellectual property rights," SSO argues, renders the provision ambiguous and requires us to construe the exclusion in SSO's favor. However, the asserted ambiguity in the exclusion is not at issue here. The Policies do not define "advertising injury" as including trademark infringement, and they unambiguously exclude coverage for such injury arising from trademark infringement. Any ambiguity created by the conflict between the language extending coverage to advertising injury arising out of "infringing upon another's copyright, trade dress, or slogan" and the language excluding coverage for injury arising out of "the infringement of copyright, patent, trademark, trade secret or other intellectual property rights" has no impact on the portion of the exclusion that does not conflict with the grant of coverage. *See Lewis by Lewis v. W. Am. Ins. Co.*, 927 S.W.2d 829, 836 (Ky. 1996) ("It is a very well established principle that where a contract contains valid and invalid clauses or conditions, and the good may be separated from the bad without affecting the integrity of the contract as a whole, the unlawful part of the contract may be eliminated and the balance of it upheld.") (citing *Gen. Acc., F. & L. Assurance Corp. v. Louisville H.T. Co.*, 193 S.W. 1031 (Ky. 1917)). Because there is no ambiguity

regarding the exclusion of coverage for trademark infringement, the allegations in Count II do not trigger coverage.

2.

In Count III, BGS alleges breach of contract. In contrast to Count II, Count III does not use the term "marks." Rather, it alleges that SSO breached the Tradename License Agreement by continuing to use BGS's name, (as defined in the Agreement). The Agreement refers to the names as "tradenames" and not "marks." SSO argues that the trademark-infringement exclusion does not apply to BGS's allegations to the extent they refer to rights in a trade *name* and not a trade*mark*. This distinction is immaterial, however, because the breach-of-contract exclusion plainly applies. Any liability resulting from use of the trade names described in Count III necessarily arises from SSO's breach of its license to use those names. That is enough to preclude coverage, without regard to whether the trademark-infringement exclusion also applies. *See Kemper Nat'l. Ins. Cos v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 874 (Ky. 2002) (Under Kentucky law, each exclusion in an insurance policy "is to be read 'independently of every other exclusion'" and "any applicable exclusion is sufficient to remove coverage") (quoting *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Grp.*, 82 S.W.3d 869, 880 (Wash. App. 1984)).

This court's decision in *Assurance Company of America v. J.P. Structures, Inc.*, Nos. 95-2384, 96-1010, 96-1027, 1997 WL 764498 (6th Cir. Dec. 3, 1997), construing an insurance policy under Michigan law, is not to the contrary. In *Assurance*, the underlying action included claims for breach of a franchise agreement as well as several trademark-infringement claims. *Id.* at *1. The district court concluded that the trademark-infringement claims "arose out of" the breach of the franchise agreement, and were therefore excluded from coverage by the breach-of-

contract exclusion, because the franchise agreement was the source of the insured's right to use the marks. *Id.* at \*3 (noting the district court's conclusion "that the claims arose out of the breach because '[t]he breach of the franchise agreement is the basis upon which all other claims are causative. Once the breach of contract has occurred and the contract was terminated, all the other causes of action became possible . . . .'"). This court reversed, finding the connection between the alleged breach of contract (failure to pay royalties) and the trademark infringement too remote to support application of the exclusion. *Id.* at \*5 ("Defendants' breach of the contract caused its termination. Defendants' intentional unauthorized use of the mark caused the trademark infringement. The contract merely withdrew the authorization to use it. The advertising injury did not arise from the breach of contract which was the failure to pay royalties."). We cannot say the same regarding BGS's allegations in Count III. BGS alleged that SSO breached the Tradename License Agreement by failing to cease use of the names after its sales fell below the threshold amount. The allegations track the wording of § 2(a) of the Tradename License Agreement. Following the reasoning in *Assurance*, the advertising injury— disparagement from SSO's use of the names—"arose out of" the breach of contract because use of the names *was* the breach alleged. Further, in *Assurance*, the court determined that, rather than arising from the breach of the franchise contract, the advertising injury arose from the trademark infringement. The opinion in *Assurance* specifically noted that the policy at issue did not mention trademark infringement. *Id.* at \*2. Here, however, coverage for trademark infringement is excluded.

## B.

Finally, SSO contends that the allegations in Count II fall within the Policies' coverage for "property damage." The Policies define "property damage" as "physical injury to tangible

property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." Under Count II, BGS alleged that as a result of SSO's use of its marks it "suffered damage by, *inter alia*, harm to its identity, reputation, and goodwill and by confusion among buyers and sellers in the firearms market and more generally among the consuming public." SSO argues that these statements represent a claim for "loss of use of tangible property" because they suggest that BGS lost the ability to sell its products.

To support its argument, SSO relies on *Lucker Manufacturing v. Home Insurance Company*, 23 F.3d 808 (3d Cir. 1994), in which the Third Circuit held that a change in customer demand for a product could constitute a "loss of use" of property. *See Lucker*, 23 F.3d at 815–16 ("[T]he loss of a non-physical use of a product, such as offering it for sale, should be considered a 'loss of use'; and . . . the decreased value of a product because of loss of customer acceptance of the product is a 'loss of use' within the meaning of the standard CGL policy."). In *Lucker Manufacturing*, the underlying plaintiff, Lucker Manufacturing, contracted with Shell Oil Company to design and manufacture a lateral mooring system (LMS) for use in offshore drilling. *Id.* at 811–12. Lucker Manufacturing purchased a "casting," a component part of the LMS, from Grede. *Id.* at 812. During a demonstration of the LMS for Shell, one of the castings supplied by Grede failed. *Id.* Shell required Lucker Manufacturing to increase the number of safety precautions in its manufacturing process, at a cost of $600,000. *Id.* Lucker Manufacturing sued Grede for the cost of compliance with Shell's requests. In a post-trial settlement, Grede assigned its rights under its insurance policy to Lucker Manufacturing and Lucker Manufacturing sued for coverage, arguing that the underlying complaint alleged a "loss of use" of tangible property, and therefore fell within Grede's coverage for "property damage liability." *Id.* In determining coverage, the Third Circuit characterized Lucker Manufacturing's "complaint, reduced to its

relevant essentials, [as] aver[ring] that the failure of the Grede castings prevented Lucker [Manufacturing] from being able to sell the LMS design to Shell." *Id.* at 814. The court found that loss of the ability to sell an object can constitute the "loss of use" of the object. But the court nonetheless found the property damage coverage inapplicable to Lucker Manufacturing's suit because the property at issue was merely the *design* for the LMS system; it was not tangible property. *Id.* at 818. Relying on *Lucker Manufacturing*, SSO argues, "Count II of the [Second Amended Complaint] claims that SSO's allegedly unauthorized use of the Trade Names created confusion and mistake among BGS's customers, who presumably would have otherwise purchased firearms and accessories (tangible property) from BGS, resulting in damage to BGS. This is a covered property damage." SSO Br. 36 (citation to the record omitted).

Liberty makes several arguments why coverage is not appropriate. First, Liberty notes that BGS's Count II is a trademark-infringement claim. Trademark infringement, Liberty argues, cannot be "property damage" under the Policies because a trademark is not "tangible" property, and in any event, BGS did not allege that it lost the use of its marks. Second, Liberty argues, BGS's allegations that it suffered damage to its "goodwill, identity, and reputation" are also not allegations of damage to tangible property. Rather, "goodwill, identity, and reputation" are all intangible. Finally, with respect to SSO's arguments under *Lucker Manufacturing*, Liberty argues in a matter of a few sentences that this case is distinguishable from *Lucker Manufacturing* because (1) the loss of customer acceptance present in *Lucker Manufacturing* is not present here, (2) this case involves no lack of demand in the marketplace for firearms, and (3) BGS did not claim any injury to or loss of use regarding its firearms.

We agree with Liberty that BGS's allegations under Count II do not fall within the Policies' coverage for "property damage liability." The Policies provide that Liberty will pay

"damages the insured becomes legally obligated to pay because of . . . 'property damage.'" R. 29-2, Policy No. L200805866, at 1. In Count II, BGS claims that SSO's trademark infringement caused "confusion among buyers and sellers in the firearms market," and harmed its "identity, reputation, and goodwill." These are not allegations of "property damage" as defined in the Policies, i.e., loss of use of tangible property. Count II contains no allegations that BGS suffered a loss of sales as a result of the trademark infringement, customer confusion, or harm to its identity, reputation, and goodwill.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's determination that Liberty had no duty to defend or indemnify SSO. In light of that conclusion, we do not address the parties' arguments regarding whether Denninghoff was a covered insured.